IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CENTER FOR BIOLOGICAL DIVERSITY,
a non-profit corporation,

    Plaintiff,

v.                                           Civil No. 01-1106 WJ/RLP ACE

MARCIA R. ANDRE, Forest
Supervisor, Gila National Forest;
ELEANOR S. TOWNS, Regional
Forester, United States Forest Service,
Region Three; DALE BOSWORTH,
Chief, United States Forest Service;
and the UNITED STATES FOREST
SERVICE,

    Defendants.

## MEMORANDUM OPINION AND ORDER

On December 10, 2001, Plaintiff filed an *Olenhouse* Brief on the Merits for Declaratory and Injunctive Relief From the Forest Service's Decision to Authorize the Corner Mountain Salvage Timber Sale (**Doc. 34**).[1] Plaintiff ("CBD") brings this action for declaratory and injunctive relief against the above-named federal Defendants (collectively referred to as "Forest Service") concerning the United States Forest Service's decision to authorize the Corner Mountain Fire Salvage Timber Sale ("Corner Mountain Salvage Sale") in the Gila National Forest

---

[1] Defendants filed a response brief on March 8, 2002, and Plaintiff filed a reply brief on April 9, 2002. Plaintiff's challenge to Defendants' agency action will be treated as an appellate brief on the merits. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994). *Olenhouse* sets out the judicial standard of review for an agency decision, which entitles the agency decision to a presumption of regularity which is nevertheless subjected to a "thorough, probing, in-depth review." Id. at 1574.

in New Mexico. After a review of the extensive Administrative Record filed with this Court, the exhibits and briefs submitted by the parties, and the applicable law, I find and conclude that the motion should be denied and that this case should be dismissed with prejudice.

**Background**

Plaintiff CBD is a non-profit organization that, *inter alia*, promotes the protection and restoration of intact forest ecosystems and the native biological diversity of forests. In this action, CBD seeks a declaration that the Forest Service's administrative decision to authorize the Corner Mountain Salvage Sale is a violation of two environmental protection statutes, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 to 4370e, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 to 1614. Plaintiff also seeks a reversal of that decision.

The sale area at issue covers about 340 acres of burned forest in an area just west/northwest of Corner Mountain in the Gila National Forest. The "B.S. fire" that caused the damage was ignited by a lightning strike on September 28, 1998 and burned nearly 7,000 acres.[2] On June 8, 2001, almost three years after the fire, the Forest Service issued a decision notice for the Corner Mountain Salvage Sale, outlining its decision to log approximately 340 acres burned by the B.S. fire. On July 23, 2001, the CBD filed a notice of appeal and statement of reasons raising concerns about the Forest Service's failure to comply with NEPA and NFMA. On September 5, 2001, the Forest Service approved the decision notice for the Corner Mountain Salvage Sale.

On September 19, 2001 the CBD sent the Forest Service a letter notifying that agency of

---

[2] The fire was named after the canyon in which the fire began.

the CBD's intention to file a lawsuit on the Forest Service's approval of the corner Mountain Salvage Sale. The letter was intended to give the Forest Service notice of the impending lawsuit before it announced the Corner Mountain Salvage Sale for bid on September 20, 2001. The CBD's letter was received by the Forest Service on September 19, 2001. The Forest Service announced the sale to prospective bidders on September 20, 2001. CBD filed the instant federal lawsuit on September 24, 2001. On October 23, 2001, the Forest Service issued a contract to Holliday Timber Products to log the Corner Mountain Salvage Area, dividing the sale into three segments, designated cutting units 1, 2 and 3.[3]

On October 26, 2001, Plaintiff filed a motion for a temporary restraining order and preliminary injunction in an attempt to stop the salvage sale pending the completion of briefing and resolution of the underlying issues on their merits. On November 21, 2001, Plaintiff filed a Motion for a Temporary Restraining Order and Preliminary Injunction. (Doc. 30). On November 29, 2001, the Court issued a ruling denying Plaintiff's motion, finding that Plaintiff had not met its heightened burden to prove the elements required to succeed on its request for a preliminary injunction under either statute.[4] Defendant's position throughout is that, given the extensive mitigation measures the Forest Service will take during and after the project, the sale will not a have significant impact on the environment and is expected to have a net beneficial effect on the environment.

---

[3] Counsel for Plaintiff advised that logging had been halted in the Corner Mountain project area during the Mexican spotted owl breeding season, from March 1, 2002 to August 31, 2002, at which point logging could commence. *See* Motion for Expedited Ruling on Plaintiff's *Olenhouse* Brief on the Merits, *Doc. 52*.

[4] The Hon. Warren W. Eginton, Senior United States District Judge for the District of Connecticut, sat by designation at the hearing on the motion for restraining order and ruled on the motion.

**Discussion**

*A.     Relevant Legal Authorities*

National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 to 4370e, charges federal agencies with the responsibility of considering every significant aspect of the environmental impact of a proposed action. *Baltimore Gas & Electric Co. v. Nat'l Res. Defense Council*, 462 U.S. 87 (1983). Through the process, the public is ensured that the agency has indeed considered the environmental effects early in the project's planning process. *North Buckhead Association v. Skinner et al.*, 903 F.2d 1533, 539-40 (11th Cir. 1990). NEPA directs agencies to prepare a detailed statement on the environmental impact for all "major Federal actions significantly affecting the quality of the human environment." This "hard look" should take into account various factors: environmental impact, unavoidable adverse effects, alternatives to the proposed action, the relationship between short-term uses and long-term productivity and irreversible commitments of resources called for by the proposal." *Sierra Club v. Hodel*, 848 F.2d 1068, 1093 (10th Cir. 1988) *rev'd on other grounds*, 949 F.2d 362 (10th Cir. 1991); 42 U.S.C. § 4332(2)(C)(i-iv).

Unless an action has been categorically excluded, regulations promulgated under NEPA require an Environmental Assessment ("EA") to be prepared for all major federal actions as a kind of crossroads in the compliance process. The EA is followed either by a "finding of no significant impact" on the human environment ("FONSI") or by the preparation of an Environmental Impact Statement ("EIS"). 40 C.F.R. § 1501.4.  In this case, the Forest Service returned a FONSI. *AR 99*.[5]

---

[5] "AR" refers to the Administrative Record.

National Forest Management Act

The National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq., requires that all National Forest lands be managed pursuant to a Land and Resource Management Plan, also referred to as a "Forest Plan."[6] The Forest Plan is a "broad, programmatic document, accompanied by an environmental impact statement and public review process conducted in accordance with [NEPA]." *Dombeck*, 185 F.3d at 1167-68; *see* 16 U.S.C. §1604(d); 36 C.F.R. § 219.10(b). As part of this Plan, the Forest Service must manage "fish and wildlife habitat to . . . maintain viable populations of existing native and desired non-native . . . species in the planning area." 36 C.F.R. § 219.19.[7]

---

[6] Forest management occurs at two levels, one concerning the development of the Forest Plan, subject to the requirements under NEPA, and the other approving or disapproving specific projects. Proposed projects must be "consistent with the Forest Plan and are subject to further [NEPA] review." *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1167-68 (10th Cir. 1999). Forest Service regulations set forth a detailed procedure for the development and review of project proposals, including public notice and comment periods on proposed actions and an administrative appeal process for challenges to the agency's decision. *See generally,* 36 C.F.R. Part 215.

[7] The Corner Mountain Salvage Sale was developed within the framework of a Forest Plan adopted pursuant to the 1982 regulations, which were superceded by regulations that initially became effective on November 9, 2000. *65 Fed.Reg. 67,514* (Nov. 9, 2000). The new regulations in part omit language in the 1982 regulations that is critical to the issues in this case relating to whether the Forest Service adequately measured the potential impact of the timber sale on wildlife habitat. However, the date of compliance with the 2000 regulations has been extended until a new final planning rule is adopted. *67 Fed.Reg. 35431* (May 20, 2002). The deadline was previously extended until May 9, 2002. *66 Fed.Reg. 27,552*. This date was found to be "unrealistic" because the Forest Service "was not sufficiently prepared to implement the November 2000 planning rule." *67 Fed.Reg. 35431-32*. The Department of Agriculture, the agency that promulgates these rules, does not expect to have a final rule in place before October 1, 2002. Id at *35432*.

The interim final rule acknowledges that "most units are not prepared to implement the November 2000 rule," but nevertheless allows the preparation of amendments or revisions of land and resource management plans under the November 2000 rule. *67 Fed.Reg. 35432*. Because the objective at present is to "maintain the status quo" with regard to land and resource management plans, *Id.*, and because the implementation of the November 2000 regulations is still in flux, the

In order to carry out this directive, the Forest Service is directed to select certain species known as Management Indicator Species ("MIS"). These species are used as a "bellwether" for "the other species that have the same special habitat needs or population characteristics." *Inland Empire Pub. Lands Council v. United States Forest Serv.*, 88 F.3d 754, 762 n.11 (9th Cir. 1996); 36 CFR § 219.19(a)(1). "The management indicator species thus becomes a 'class representative' which allows the Forest Service to evaluate the effects of proposed alternative management activity on general fish and wildlife populations without having to evaluate each species individually." *Id., 762 n.11*.

Standard of Review

Where a statute, such as NEPA or NFMA, does not provide for a private right of action, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, provides for judicial review for challenges to final agency actions. In accordance with the APA, a reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999) (In determining whether an agency acted in an "arbitrary and capricious manner," the Court must "ensure that the agency decision was based on a consideration of relevant factors and examine whether there has been a clear error of judgment").

This standard of judicial review is narrow and deferential to the agency. Because the arbitrary and capricious standard "focuses on the rationality of the agency's decisionmaking process rather than on the rationality of the actual decision, . . . the agency's action must be

---

new regulations do not effect or otherwise moot the Court's analysis and ruling.

upheld, if at all, on the basis articulated by the agency itself." *Olenhouse v Commodity Credit Corporation*, 42 F.3d 1560, 1574 (10th Cir. 1994).

B.     *Factual Issues Relative to NFMA*

Plaintiff contends that the Forest Service violated NFMA by its failure to acquire and analyze population data on MIS before approving the Corner Mountain Salvage Sale. CBD points out that the Forest Service's findings on MIS were based on a general review of habitat needs for cavity nesting birds instead of actual population data for MIS species such as the hairy woodpecker and common flicker, two cavity nesting MIS bird species.

Defendants do not argue that the MIS regulations do not require the collection of actual population data for analysis of effects of individual resource management projects.[8] Instead, Defendants maintain that the Forest Service provided extensive information on MIS, including

---

[8] Defendants recognize the split in circuits on the issue, but also acknowledge that a recent District of New Mexico case, *Forest Guardians v. U.S. Forest Service*, 180 F.Supp.2d 1273 (D.N.M. 2001), sided with the Eleventh Circuit in finding that the Forest Service is "obligated as a matter of law to acquire and analyze population data (both actual and trend)" for MIS in the proposed project area. *Forest Guardians*, 180 F.Supp.2d at 1282. The New Mexico District Court based its decision on the rationale set out in *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1170 (10th Cir. 1999) which suggested, without actually finding, that MIS regulations required hard population data, although the *Dombeck* court did not apply the requirement to that case at bar since there was no evidence that a particular species was even present within the relevant planning area.

I find the reasoning in the *Forest Guardians* case persuasive. Further, the express language of the relevant regulatory provision calls for an evaluation of *both* "amount and quality of habitat *and* of animal population trends of the management indicator species." 36 C.F.R. § 219.19(a)(2) *(emphasis added)*; *cmp., Utah Environmental Congress et al v. Zieroth et al.*, 190 F.Supp. 2d 1265 (D.Utah) (concluding that where population data was available, but the Forest Service just decided "not to collect it," use of habitat trend data rather than actual or trend population data on MIS was insufficient to comply with requirements of NFMA). Thus, my analysis on alleged NFMA violations is directed to whether the Forest Service fulfilled these obligations under NFMA.

7

population information and the fire's effect on their habitat, in both the Administrative Record and Supplemental MIS Report, and made a reasonable determination that the Corner Mountain Salvage Sale would have negligible or no impact on any MIS that may be present in the project area. The Forest Service thus concluded that the project would have no or negligible effects on MIS in the overall management of the Forest.

Supplemental MIS Report

Plaintiff urges the Court to ignore the supplemental report on MIS (Attachment I to Defts' Notice of Lodging Administrative Record) which was prepared after the timber sale was approved. Defendants provided the report to demonstrate that it had in fact complied with NFMS requirements. It was prepared in the wake of the New Mexico District Court decision which held that NFMA regulations required the Forest Service to gather and analyze actual population data on selected MIS prior to approving a timber sale encompassing over 13,000 acres. *See Forest Guardians v. U.S. Forest Service*, 180 F.Supp.2d 1272 (D.N.M. 2001); *see* n.8, *supra*.

While Supplementary Information Reports ("SIRs") are not mentioned in the procedural framework of the NEPA statute or regulations, courts nevertheless have "upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Idaho Sporting Congress, Inc. et al v. Alexander, et al*, 222 F.3d 562, 565-66 (9th Cir. 2000). The SIR at issue here was considered by the Court when it denied Plaintiff's motion for preliminary injunction. *Doc. 33, at 13*. I see no reason to exclude it when considering the merits of Plaintiff's claims.

Plaintiff has presented some case law which supports its view that SIRs should not be considered as a way to present information that the Forest Service was required, but failed to include in its original NEPA documents. *Idaho*, 222 F.3d at 567. Arguably, the information

8

which the Forest Service has compiled in the SIR is neither new nor changed.  At the same time, I recognize that courts have allowed such supplemental information to be considered after the time during which it should have been compiled.  If "extra-record evidence shows that an agency has rectified a NEPA violation after the onset of legal proceedings, that evidence is relevant to the question of whether relief should be granted." *Friends of the Clearwater et al v. Dombeck et al*, 222 F.3d 552, 560 (9th Cir. 2000) (considering post-record supplemental information and commenting that "it would serve no useful purpose to remand [case to district court] for it to order the Forest Service to prepare studies that the Forest Service already has completed and that cannot be successfully challenged") (citing *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1025-26 (9th Cir. 1980) (where supplemental documents that were presented during course of appeal cured legal deficiency and obviated need to remand case to agency); *see also Marsh v. Oregon Nat'l Resources Council, et al.*, 490 U.S. 360, 377 (1989) (considering supplemental environmental impact statement prepared by federal agency after onset of litigation to conclude that agency had complied with NEPA); *Olenhouse*, 42 F.3d at 1575 (allowing for supplementation of record as an option to remand where the existing record is insufficient for the court to affirm agency decision).

In the present case, Defendants' supplemental MIS report offers additional evidence on the issue of whether the Forest Service's treatment of MIS was consistent with NFMA regulations and whether the Forest Service was justified in deciding that an EIS was not required under NEPA.  Further, in light of the very real possibility that future NFMA requirements will no longer mandate population sampling on all MIS.[9]  I see no reason in ignoring the supplemental

---

[9] *See 65 Fed.Reg. 67514, 67546* (with the objective of reducing "burdensome and costly procedural requirements," proposing population sampling for "some focal species and some

report if it meets MIS requirements, only to have the Forest Service do it all over again -- on the *sole* basis that it wasn't done earlier. *See, e.g., Warm Springs*, 621 F.2d at 1025-26 (district court could not order federal agency to conduct studies already completed).

Whether Forest Service Complied with NFMA Requirements

According to the Supplemental MIS Report, twenty-six MIS were considered in the Corner Mountain Salvage Sale analysis, but only nine were found to have the potential of being affected by the project.[10] Each of these species serves as indicators detecting major habitat changes to vegetation type.

Plaintiff's disagreement with the geographic level from which the data was collected does not sufficiently form the basis for a violation under NFMA. The Forest Service has discretion regarding identification of the geographic area within which the effects of environmental impacts are measured. *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) (choice of geographic area is a "task assigned to the special competency of the appropriate agencies"). The Forest Service determined that population trend measurements were more "meaningful" on the larger scale of the Gila National Forest than on the local level because many of the selected MIS species were found beyond the local scale of the project analysis area. *Suppl. MIS at 6*. However, population data and trends were then considered within the specific context of the proposed timber sale.[11] I find that this exercise of discretion effectuates the purpose behind the MIS regulation -- to "meet the

---

species-at-risk as appropriate").

[10] Species were chosen based on the 1986 EIS for the Gila National Forest Plan.

[11] The decision to use a broader measurement scale was not applied to all the MIS species. For example, in addition to noting forest-wide population trends in Rocky Mountain elk, the Supplemental MIS also noted population data for elk in Game Management Unit 16, which comprised the area of the Corner Mountain Salvage Sale. *Suppl. MIS, at 6*.

10

protection and management needs" of MIS species. 36 C.F.R. § 219.19(a)(7).

The Supplemental MIS Report contains hard population data presented in actual and graphic form. It describes the impact of the timber sale on MIS such as the Rocky Mountain elk, mule deer, Mexican spotted owl, Merriam's turkey, common (norther) flicker, blue grouse, hairy woodpecker, long-tailed vole, and Mogollan (Mexican) vole.

The Environmental Assessment ("EA") for species with which Plaintiff seems most concerned, the hairy woodpecker and common flicker, includes information which indicates that direct and indirect impacts to these species would be "minimal" due to the "high number of snags in the general vicinity"and that the population had increased with the "increase in snag habitat provided by recent fires." EA, AR at 33-34.[12] The Supplemental MIS Report contains additional information to support these findings. Population numbers and trends for the common flicker, e.g., were found to be "stable, and abundant," with graphic displays depicting a "slightly upward trend for the Norther flicker in New Mexico." *Suppl. MIS at 12-13*. It was noted that although the "salvage harvest" activities would remove potential snags, the small scale of the project (340 acres) "will not have a detectable effect on the [common flicker] because surrounding habitat contains over 150 snags/acre." *Id. at 13*. Similarly, removal of dead trees and snags within the project area would not have a "detectable effect" on the population levels of hairy woodpeckers due to the high number of snags in the area immediately surrounding the project area. *Id. at 16*.

It was noted that implementation of the timber sale "may affect," but is not likely to adversely affect the Mexican spotted owl." *Id. at 10*.[13] The document notes that a previous

---

[12] The EA is also attached at Plaintiff's Exhibit 1.

[13] The Mexican spotted owl is an indicator of "high seral stage mixed conifer and high elevation riparian." *Id. at 9*.

"catastrophic fire" had eliminated 340 acres of "high seral condition mixed conifer acreage," so that "high vegetation seral stages are now lacking in the project area." As a result, because the timber sale would not change "existing seral conditions created by the fire," it would not have "detectable effect on the population trends" of that species. *Id. at 10-11*. The Supplemental MIS Report continued with similar information regarding the impact of the proposed timber sale, as well as actual population data and trends, on each of the MIS species listed.

Plaintiff challenges the population data as being "outdated." Other than a reference to "available scientific information," 36 C.F.R. § 219.19(a)(1), and to monitoring that is to be done "to the extent practicable," 36 C.F.R. § 219.19(a)(6), MIS regulations do not specify how recent population data should be. While much of the actual population data is from 1998, the Forest Service's findings were not predicated solely on those raw numbers. Rather, this data was used as a starting point and updated with reports by project biologists, *Suppl. MIS at 10*, and reports collected for long-range management plans which span into the future. *Suppl. MIS at 11* ("NMDGF Long Range Plan for the Management of Wild Turkey in new Mexico 2001-2005"). Accordingly, I find that the population survey and data of MIS species meets NFMA statutory and regulatory requirements.

<u>Prohibition on Cutting Conifers over 24 Inches in Diameter</u>

Under the NFMA, timber sale decisions authorizing contracts "for the use and occupancy of National forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Plaintiff alleges that the Corner Mountain Salvage Sale is inconsistent with the Gila National Forest Plan's prohibition on cutting trees over 24 inches in diameter [at breast height] in

mixed conifer habitat. This prohibition, one of several guidelines which implement standards designed to protect the Mexican spotted owl, applied to mixed-conifer and pine-oak forests. *Pltff's Ex. 8 at 89.*

Plaintiff's claim fails. These guidelines, unlike the standards they implement, may contain discretionary elements. Pltff's Ex. 8 at 87, 90. In this case, the Forest Service did in fact take a look at the guideline in the context of the proposed timber sale, and concluded that the Corner Mountain Salvage Sale was consistent with it. After the B.S. fire, the project area could no longer be considered "mixed conifer or pine-oak forest" since so many trees died in the fire and the area had essentially reverted to "early seral stages." *AR 55 at 30.* Defendants further point out that the guideline refers to "*trees* greater than 24 inches [in diameter,]" not the timber harvested in the proposed project, which comes from *snags*.[14] The EA noted that because "foraging habit was severely degraded or eliminated" as a result of the fire, the geographic area at issue had been rendered unsuitable for owls and was "vacant" of owl habitat. *AR 55 at 30.* This conclusion, as the Forest Service's interpretation of its own Forest Plan, is afforded great deference. *Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), quoted in *Lamb et al., v. Thompson et al.*, 265 F.3d 1038, 1047 (10th Cir. 2001). Thus, it was neither unreasonable nor erroneous for the Forest Service to determine that the amendment, which had as its objective to protect the Mexican spotted owl, did not apply to the specific areas being considered for the timber sale since the area was no longer considered to be either suitable owl habitat or mixed-conifer habitat. *See Stinson v. U.S.*, 508 U.S. 36, 45 (1993) (Forest Service's interpretations of

---

[14] A "snag," as defined in the Oxford English Dictionary, 2nd ed. (1989), is a "short stump standing out from the trunk, or from a stout branch, of a tree or shrub, especially one which has been left after cutting or pruning."

13

its own regulations or forest plan are given "controlling weight" unless plainly erroneous or inconsistent with the regulations), *cited in Lamb*, 265 F.3d at 1047.

I therefore find that, despite Plaintiff's contentions to the contrary, the Forest Service complied with NFMA requirements in acquiring and analyzing population data on MIS species.

## C. *Factual Issues Relevant to NEPA*

NEPA regulations are part of the process by which a forest plan is created and implemented. 16 U.S.C. § 1604(g)(1); *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994) (NEPA regulations require an environmental impact statement before adopting forest plan). Plaintiff charges the Forest Service with violations of NEPA, contending that the agency did not take the requisite "hard look" at the environmental consequences of the proposed Corner Mountain Salvage Sale before approving the project and failed to consider a reasonable range of alternatives to the proposed.[15]

Plaintiff contends that the Forest Service did not consider any of twenty-one studies on the impacts of post-fire salvage logging, but its brief on the merits focuses only on two reports: Beschta Report and a Forest Service synopsis of existing literature which Plaintiff refers to as the "McIver and Starr Report." I need not address those reports for which Plaintiff has not explained their significance or relevance to the Corner Mountain Salvage Sale.

The Forest Service did not go into a detailed discussion on either the Beschta Report or

---

[15] The following analysis and discussion includes a consideration of the supplemental authorities submitted by both parties after briefing was completed. Plaintiff's objections to the Defendants' notice of supplemental authority as procedurally deficient are somewhat disingenuous, since Defendants supplementation is essentially a response to the issue presented by Plaintiff -- i.e., whether the Forest Service violated NEPA by failing to "disclose and discuss" two particular scientific studies. Plaintiff's submission of an unpublished case from the Northern District of California, which relies on Ninth Circuit precedent, deserved a response by the Defendants clarifying their understanding of the Tenth Circuit's position on the issues.

14

the McIver and Starr Report, nor did it have to do so. NEPA's procedural requirements do not require that an agency provide a detailed discussion on every document being considered – or eliminated. *Sierra Club v. Watkins*, 808 F.Supp. 852, 862 (D.D.C. 1991) ("NEPA does not require a federal agency to consider and discuss every viewpoint in the scientific community on a given matter"). Nevertheless, the Beschta Report[16] had in fact been taken into account by the Forest Service. It was reviewed by a Forest Soil Scientist for the Forest Service, who found the report to be biased towards a "hands off" approach, and not relevant to the Corner Mountain Salvage Sale because it was "general in nature," lacked peer review and "specific research data to support the recommendations," and addressed climate conditions and soil types found in the Pacific Northwest rather than the "arid Southwest." *Deft's Ex. A to Prel. Inj. Resp., at 3, 5.*

Similarly, Plaintiff's assertion that the McIver and Starr Report was not considered is not borne out by the evidence in the administrative record.[17] It is true that the Forest Service did not rely on the Report to analyze potential impacts of the proposed timber sale. Instead, it chose to rely on the Southwestern Region's 1998 "Disturbed Area Rehabilitation Review Report" ("Regional Report"), in which a team of Forest Service experts reviewed and analyzed the results of 19 post-disturbance treatments in the southwest region.

The Forest Service was not required to follow the recommendations in the reports preferred by Plaintiff, even if those opposing views are more persuasive. Rather, NEPA "prohibits uninformed -- rather than unwise--agency action." *Custer County Action Association*

---

[16] The Beschta Report recommends "natural recovery" for post-fire landscapes and that human intervention "should not be permitted unless and until it is determined that natural recovery processes are not occurring. *AR D at 5.*

[17] This Report is itself a review of 21 post-fire logging studies.

*v. Garvey*, 256 F.3d 1024, 1034 (10th Cir.2001). What *is* critical is that, based on a careful review of the record, the agency made a reasoned decision based on its evaluation of the significance--or lack of significance--of those reports. *Marsh*, 490 U.S. 360, 377 (an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive). In analyzing the environmental impacts of the Corner Mountain Salvage Sale, the Forest Service could rely on recommendations from its own experts and findings from its own research and reports as long as it made a reasonable, good faith objective presentation of the facts. *Dombeck*, at 1176-77. In this case, it was reasonable that the Forest Service would find the information in the Regional Report, and the recommendations of its own experts, more relevant to conditions found at the Corner Mountain Salvage area and were thus entitled to follow those recommendations rather than those in either the Beschta Report or the McIver and Starr Report.[18]

NEPA imposes procedural requirements which the agency must follow -- compliance is all about process, not outcome. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989) (NEPA "does not work by mandating that agencies achieve particular substantive environmental results"). In addition to reviewing research and reports on salvage operations, the Forest Service conducted its own on-site tests and observations regarding soil erosion and soil rehabilitation. *AR 54*. The agency took an interdisciplinary approach in looking at post-salvage activities (e.g., road reconstruction and harvesting) which had both direct and indirect effects on soil, plant regeneration in the burn area, water yield and quality, air quality and grazing for

---

[18] The Forest Service expert found, e.g., that some of the recommendations in the McIver and Starr Report were based on hypotheses that had not been scientifically tested. *Deft's Ex. A to Prel. Inj. Resp. at 4.*

16

livestock. *E.g., AR 33, 91*. This information went into the Forest Service's development of mitigation measures specific to the area being affected by the Corner Mountain Salvage Sale. I find that the Forest Service undertook a common-sense approach, but one which was nevertheless in compliance with NEPA requirements, in order to determine what environmental impacts would result from the proposed timber sale, and what measures should be taken to mitigate those impacts.

Plaintiff's contentions and supportive arguments concerning the amount of detail contained within the EA, particularly with regard to the discussions on scientific reports, have no merit. These contentions apply to the requirements for an EIS, not the more general EA, which is supposed to be more general and brief.[19] Likewise, Plaintiff is not satisfied with the number and type of alternatives the Forest Service considered. The agency considered seven alternatives, ranging from no harvesting, to alternatives that called for harvesting of substantially *less* timber than the preferred alternative, to alternatives that would have harvested substantially *more* timber than the preferred alternative. *AR at 55, 12-14*. The purpose of the proposed timber sale, as set out in the EA, is to provide wood products within the local communities. *Pltff's Ex.1 at 7*. Plaintiff objects to the Forest Service's proposal of two alternatives which contemplate the same volume of timber to be harvested. In light of the very purpose behind the project under examination – making more wood available for local communities – the Forest Service's decision to consider those two final alternatives was neither arbitrary nor capricious.

NEPA does not require agencies to elevate environmental concerns over other

---

[19] Under the regulations, an environmental assessment ("EA") is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. . . ."

17

appropriate considerations. It only requires that the agency take a "hard look" at the environmental consequences before taking a major action. *Baltimore Gas & Elec. Co., v. Nat'l Resources Defense Council, Inc., et al.*, 462 U.S. 87, 97 (1983). The role of the courts in reviewing compliance with NEPA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Id.* As this Court noted in the order denying Plaintiff's motion for a preliminary injunction, the Forest Service must be concerned with weighing and balancing other issues besides environmental, such as social and economic benefits, and public safety issues. *Doc. 30, at 14*.

### Conclusion

In sum, I find and conclude that the Forest Service complied with requirements under NFMA in that the agency acquired and analyzed population data on MIS before approving the Corner Mountain Salvage Sale. I also find and conclude that the Forest Service took the requisite "hard look" at environmental consequences of the timber sale. The agency conducted site visits and filed studies in the actual area proposed for the timber sale, analyzed potential effects based on a report reviewing post-fire activities in this same region, considered and proposed measures that would heavily mitigate any significant impacts on the environment. NEPA requires nothing more.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's request for Declaratory and Injunctive Relief From the Forest Service's Decision to Authorize the Corner Mountain Salvage Timber Sale **(Doc. 34)** is hereby DENIED, thereby DISMISSING this case WITH PREJUDICE in its entirety.

UNITED STATES DISTRICT JUDGE